UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DAVID LESTER,

                          Plaintiff,

          v.                                          **DECISION AND ORDER**
                                                      04-CV-850S

M&M KNOPF AUTO PARTS and DELCO
REMY AMERICAN, INC.,

                          Defendants.

## I.  INTRODUCTION

In this action, Plaintiff David Lester alleges that his former employers, Defendants

M&M Knopf Auto Parts and Delco Remy American, Inc.,[1] unlawfully discriminated against

him based on his race and disability.  He seeks redress under Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), the Civil Rights Act of 1870, as

amended, 42 U.S.C. § 1981, the Americans With Disabilities Act of 1990, as amended, 42

U.S.C. § 12101 et seq. ("ADA"), and the New York Human Rights Law, N.Y. Exec. Law §

290, et seq. ("NY HRL").  Presently before this Court is Defendants' Motion for Summary

Judgment.  For the reasons stated below, Defendants' motion is granted in part and denied

in part.

## II.  BACKGROUND

### A.    Procedural History

Plaintiff instituted this action on October 18, 2004, and filed an Amended Complaint

on April 15, 2005.  Defendants filed an Answer thereto on April 22, 2005.

---

[1]Defendant Delco Remy American, Inc.'s connection to this case is unexplained.  Plaintiff alleges
in his Amended Complaint that M&M Knopf is a division or subsidiary of Delco, but M&M Knopf denies the
existence of any entity by this name.  Whatever the relationship, Delco remains a named defendant in this
case, and it appears that there has been no effort to dismiss it out.

Defendants filed the instant Motion for Summary Judgment on December 5, 2005. In support of their motion, Defendants filed a Rule 56 Statement of Undisputed Facts, with appendix, and a memorandum of law.  This Court thereafter issued a scheduling Order directing Plaintiff to file a response to Defendants' motion on or before January 17, 2006.

On January 18, 2006, one day after the deadline imposed by this Court, Plaintiff filed the Affidavit of David Lester, which included both an affidavit and a section entitled "Counterstatement of Material Facts."  Plaintiff re-filed this affidavit in redacted form on January 31, 2006.  This submission was the only response Plaintiff filed in opposition to Defendants' motion.

On February 14, 2006, this Court issued an Order granting Defendants' request to strike Plaintiff's January 18 and January 31 filings because they failed to satisfy the requirements of this district's local rules.[2]  In particular, this Court found that Plaintiff's submissions failed to comply with Local Rule 7.1(e) because they did not include an answering memorandum, and failed to comply with Local Rule 56.1(b) and (d) because they did not include a separate, short and concise statement of disputed facts supported by citations to admissible evidence in the record.  (See Docket No. 42.)

This Court declined, however, to grant summary judgment in Defendants' favor, as Defendants requested and as Local Rule 7.1(e) would permit, and instead afforded Plaintiff additional time to file and serve a proper response to Defendants' motion.  In addition, this Court specifically warned Plaintiff that further non-compliance could result in the material

---

[2]Despite this Court's Order striking these filings, Plaintiff cites to them several times in support of his arguments.  (See, e.g., Plaintiff's Memorandum, pp. 5-6, 9, 13, 14, 17.)  However, the stricken documents are not properly before this Court and have therefore not been considered.

facts asserted by Defendants being deemed admitted under Local Rule 56.1(c) or could lead to the motion being resolved in Defendants' favor pursuant to Local Rule 7.1(e).  (See Docket No. 42.)

On February 28, 2006, despite this Court's previous Order and its warning of the consequences for failing to file a proper response, Plaintiff filed only a memorandum of law and the Affidavit of David Lester, with exhibit, in opposition to Defendants' motion.  Plaintiff again inexplicitly failed to file a Rule 56 Statement of Disputed Facts as required by the local rules.  Defendants filed reply memoranda on January 30 and March 14, 2006.[3]

"When a party has moved for summary judgment on the basis of asserted facts supported as required by Fed.R.Civ.P. 56(e) and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party."  Glazer v. Formica Corp., 964 F.2d 149, 154 (2d Cir. 1992).  In light of Plaintiff's express failure to properly controvert Defendants' statement of facts, this Court will deem those factual assertions admitted to the extent they are supported by the record evidence.  See Local Rule 56.1(c) (statements of undisputed fact that are not controverted by the non-moving party are deemed admitted); Cassidy v. Nicolo, No. 03-CV-6603, 2005 WL 3334523, at *2 (W.D.N.Y. Dec. 7, 2005) (facts asserted by the defendants deemed admitted where the plaintiff failed to file a response); Samborski v. W. Valley Nuclear Svcs. Co., Inc., No. 99-CV-213, 2002 WL 1477610, at *1-3 (W.D.N.Y.

---

[3]Plaintiff's non-compliance with the local rules caused this Court to adjourn the oral argument originally scheduled for February 15, 2006, and forced Defendants to prepare and file two reply memoranda.

June 25, 2002) (same).

**B.    Facts[4]**

Defendant M&M Knopf Auto Parts operates in Buffalo, N.Y., under the name Great Lakes Core Supply.  (Defendants' Statement, ¶ 2.[5])  It is in the business of procuring, sorting, cleaning and breaking down used car and truck parts, and then selling those parts to companies that rebuild them for sale in the aftermarket.   (Defendants' Statement, ¶ 1.) Paul Gahagan is the current general manager at Great Lakes and Lee Bush (Gahagan's father) is the former general manager.   (Defendants' Statement, ¶ 3.)

In September of 1996, Gahagan and Bush hired Plaintiff, who is African-American, to work as a general laborer at Great Lakes' Selkirk Street facility.  (Defendants' Statement, ¶¶ 2, 3.)   Gahagan, Bush and Plaintiff had all previously worked together at the predecessor company called World Auto Parts, with several other individuals who also became M&M Knopf employees – Vito Verni, Carlos DeChellis and Ed Orrange. (Defendants' Statement, ¶ 4.)   As a general laborer, Plaintiff worked on the docks unloading trucks and packing and sorting materials.   (Defendants' Statement, ¶ 6.) Defendants also assigned Plaintiff to other tasks in the facility, depending on need. (Defendants' Statement, ¶ 7.)

At the time Plaintiff was hired, M&M Knopf employed approximately eight people at the Great Lakes Selkirk Street facility.  (Defendants' Statement, ¶ 8.)  The labor force grew to nineteen individuals by 2004, twelve of whom were minorities belonging to various

---

[4]Additional facts are included below in the discussion of Plaintiff's individual claims.

[5]Referring to Defendants' Rule 56 Statement of Undisputed Material Facts, which contains citations to the record evidence.

4

ethnic groups, and seven of whom were Caucasian.  (Defendants' Statement, ¶ 10.)  However, given the seasonal nature of the business, M&M Knopf had to implement various layoffs over the years due to lack of work.  (Defendants' Statement, ¶ 17.)

### 1.    Layoffs

M&M Knopf did not make layoff decisions based on seniority, nor did it have a policy of implementing layoffs by seniority.  (Defendants' Statement, ¶¶ 18, 20.)  Instead, given the small size of the Selkirk Street facility, M&M Knopf's goal was to maintain the best workforce it could by retaining the most qualified, highly productive and versatile employees.  (Defendants' Statement, ¶ 18.)  To that end, the company also evaluated whether the duties of an employee being considered for a layoff could be absorbed by remaining employees.  (Defendants' Statement, ¶ 19.)

Plaintiff contends that Gahagan first laid off Plaintiff and a Cambodian employee due to "no work" in January of 1997.  (Defendants' Statement, ¶¶ 21, 22.)  Gahagan denies laying off Plaintiff at this time.  (Defendants' Statement, ¶ 23.)

In 1999 or 2000, Gahagan conducted a layoff at the request of M&M Knopf's corporate office due to a work slowdown.  (Defendants' Statement, ¶ 24.)  He laid off Plaintiff and an Asian employee named Laysoth Soy.  (Defendants' Statement, ¶ 25.)  Gahagan selected Plaintiff and Soy for the layoff because he and the other managers determined that they were the least productive employees at the facility, and because they determined that the remaining employees could absorb their job duties.  (Defendants' Statement, ¶ 26.)  M&M Knopf recalled Plaintiff to work after approximately three or four months.  (Defendants' Statement, ¶¶ 27, 28.)

5

In January of 2003, the corporate office again instructed Gahagan to implement a layoff due to lack of work.  (Defendants' Statement, ¶ 30.)  Gahagan laid off Plaintiff and John Haak, a Caucasian.[6]   (Defendants' Statement, ¶ 31.)   Again, Gahagan selected Plaintiff and Haak for the layoff because he and the other managers determined that they were the least productive employees at the facility, and because they determined that the remaining employees could absorb their duties.  (Defendants' Statement, ¶ 33.)  In March of 2003, Gahagan recalled Plaintiff to work and increased his pay.   (Defendants' Statement, ¶ 35.)  Haak was not called back to work.  (Defendants' Statement, ¶ 36.)

Upon Plaintiff's return, Gahagan assigned him to the "tear down" area due to an employee shortage at that time.  (Defendants' Statement, ¶ 40.)  In this position, Plaintiff was responsible for disassembling starters and alternators, and sorting component parts for resale.  (Defendants' Statement, ¶ 41.)  The ability to meet production expectations and to complete tasks with speed and quality was required of employees working in the "tear down" area.  (Defendants' Statement, ¶ 45.)

Plaintiff did not perform well.   He continuously failed to meet production expectations.   (Defendants' Statement, ¶ 42.)   For example, Plaintiff produced approximately three drums of electrical components per day, while his two co-workers – Eddie Ernest and Junior Loder – produced approximately ten drums each per day.  (Defendants' Statement, ¶ 43.)  Ed Orrange, the electrical manager, counseled Plaintiff regarding his lack of productivity.  (Defendants' Statement, ¶ 44.)

---

[6]Plaintiff testified in his deposition that M&M Knopf also laid off Mothy Phath, an Asian individual, at this time.  (Defendants' Statement, ¶ 31; Lester Dep., p. 85.)  Defendants deny that Mothy Phath was laid off at that time.  (Defendants' Statement, ¶ 32.)

In late 2003, the corporate office again instructed Gahagan to implement a layoff due to lack of work.  (Defendants' Statement, ¶ 46.)  Gahagan first laid off Joseph Vega, a Caucasian employee who worked in the "tear down" area.  (Defendants' Statement, ¶ 47.)  Gahagan then laid off Plaintiff on January 22, 2004, because of his low productivity, particularly when compared to Ernest and Loder.  (Defendants' Statement, ¶ 48.)  In addition, Plaintiff was selected for the layoff because both Ernest and Loder were deemed more qualified than Plaintiff given their "superior knowledge" of auto parts and testing equipment.  (Defendants' Statement, ¶¶ 49-50.)  Gahagan advised Plaintiff that he would be the first to be recalled when the company was able to rehire employees.  (Defendants' Statement, ¶ 61.)

During this layoff, Plaintiff repeatedly telephoned Great Lakes to determine his status, and the company encouraged him to stay in touch.  (Defendants' Statement, ¶ 57.)  In April of 2004, Gahagan received authority from the corporate office to add an employee due to a slight increase in work.  (Defendants' Statement, ¶ 58.)  Rather than hire a new employee, Gahagan recalled Plaintiff.  (Defendants' Statement, ¶ 59.)  Gahagan did not recall Vega, a Caucasian employee, despite the fact that Vega was laid off prior to Plaintiff. (Defendants' Statement, ¶¶ 60.)

Plaintiff returned to work in the "tear down" area in Ed Orrange's department. (Defendants' Statement, ¶ 62.)  Plaintiff worked for two days and then never returned or contacted the company.  (Defendants' Statement, ¶¶ 63, 64.)  M&M Knopf later sent Plaintiff a letter advising him that his employment was terminated because he abandoned his job.  (Defendants' Statement, ¶ 67.)

7

### 2.      Plaintiff's Disability

Plaintiff claims that he suffers from "fetal alcohol syndrome" caused by his mother's consumption of alcohol during her pregnancy with him.  (Defendants' Statement, ¶ 118.) He does not identify any physical limitations as a result of this condition, but he reports taking medication for depression and high blood pressure.  (Defendants' Statement, ¶ 128.)

Plaintiff alleges that as a result of this condition, he is not a fast learner and has difficulty with his memory.  (Defendants' Statement, ¶ 119.)  He claims that he has difficulty remembering numbers and that Gahagan wrote part numbers down for him when necessary to perform his job.  (Defendants' Statement, ¶ 129.)  Plaintiff alleges that after eight years of working for M&M Knopf, he "could perform as far as laborer," but had difficulty with the "mental aspect" of the job.  (Defendants' Statement, ¶ 131.)

Despite his condition, Plaintiff testified that he can read and write, and in fact, enjoys reading about American history.  (Defendants' Statement, ¶ 125.)  He is able to remember and discuss such topics as religion, politics and history.  (Defendants' Statement, ¶ 126.) In addition, Plaintiff watches televison news programs and reads the local newspaper. (Defendants' Statement, ¶ 127.)

Plaintiff alleges that he advised Gahagan and Bush at the time that he was hired that his mother drank when she had him and that "it took time" for him to learn things. (Defendants' Statement, ¶¶ 120, 121.)   According to Plaintiff, Gahagan and Bush responded, "that's okay" and "don't worry about it." (Defendants' Statement, ¶ 122.) Gahagan denies that Plaintiff ever advised him of his fetal alcohol syndrome.  (Defendants'

Statement, ¶ 123.)  However, Plaintiff contends that M&M Knopf laid him off due to his disability because Gahagan allegedly told him that "you're the best worker we got, but you're too slow."  (Defendants' Statement, ¶ 132.)

## C.   Plaintiff's EEOC Charges

Plaintiff first filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on May 11, 2004.  (Defendants' Appendix, Exhibit H.)  Therein, Plaintiff alleged that he had been laid off on January 22, 2004, because of his race.  He also asserted a hostile work environment claim.  After conducting an investigation, the EEOC found no evidence to support Plaintiff's claims of unlawful discrimination and issued him a Right to Sue Letter on July 22, 2004.  (Defendants' Appendix, Exhibit I.)

Plaintiff filed a second Charge of Discrimination with the EEOC on November 4, 2004, wherein he alleged that he had been laid off on January 22, 2004, because he is disabled.  (Defendants' Appendix, Exhibit J.)  He also asserted a hostile work environment claim.  On December 6, 2004, Plaintiff filed an Amended Charge, in which he included both his race-based and disability-based discrimination claims, as well as his hostile work environment claim.  (Defendants' Appendix, Exhibit K.)  The EEOC dismissed Plaintiff's Amended Charge on April 8, 2005, after Plaintiff requested that the EEOC issue him a Right to Sue Letter.  (Defendants' Appendix, Exhibit L.)

### III.  DISCUSSION AND ANALYSIS

**A.     Summary Judgment Standard**

Federal Rule of Civil Procedure 56 provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  A fact is "material" if it "might affect the outcome of the suit under governing law." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S.Ct.1598, 1609, 26 L.Ed.2d 142 (1970).  "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

In the context of employment discrimination cases, the United States Court of Appeals for the Second Circuit has explicitly cautioned district courts to use extra care when deciding whether to grant summary judgment because "the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary

adjudication." Eastmer v. Williamsville Cent. Sch. Dist., 977 F. Supp. 207, 212 (W.D.N.Y. 1997) (quoting Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)). Nonetheless, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). Indeed, the Second Circuit has noted that "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation."  Id.

**B.    Plaintiff's Discrimination Claims**

Defendants argue that they are entitled to summary judgment on Plaintiff's discrimination claims because (1) several of the claims are untimely, (2) several of the claims have not been exhausted, and (3) Plaintiff cannot meet his evidentiary burden on the remaining claims.  Plaintiff urges this Court to deny Defendants' motion because the continuing violation doctrine applies and he has set forth sufficient evidence to raise triable issues of fact on the merits of his discrimination claims.

**1.    Timeliness**

Plaintiff brings his employment discrimination claims under separate provisions of law containing different limitations periods.  For purposes of Plaintiff's Title VII and ADA claims, a charge of discrimination must be filed with the EEOC within 300 days of the alleged discrimination. 42 U.S.C. §2000e-5(e); 42 U.S.C. § 12117(a); Harris v. City of New York, 186 F.3d 243, 247 n. 2 (2d Cir. 1999).  Plaintiff's § 1981 claims, on the other hand, are subject to the four-year catchall statute of limitations set forth in 28 U.S.C. § 1658(a).

See Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382-83, 124 S.Ct. 1836, 1845-46, 158 L.Ed.2d 645 (2004).   Finally, the statute of limitations applicable to Plaintiff's discrimination claims brought under the NY HRL is three years.  See N.Y. C.P.L.R. § 214 (McKinney 2002); Greene v. Trs. of Columbia Univ., 234 F.Supp.2d 368, 377 (S.D.N.Y. 2002).

Applying these limitations periods in this case, this Court finds that the only timely claims for Title VII purposes are those arising on or after July 16, 2003, for ADA purposes are those arising on or after December 9, 2003, for § 1981 purposes are those arising on or after October 18, 2000, and for NY HRL purposes are those arising on or after October 18, 2001.

Plaintiff argues that the continuing violation doctrine saves his untimely Title VII and ADA claims because Defendants engaged in a continuing pattern of discrimination.  "The 'continuing violation' doctrine holds that an act that occurs within 300 days of an EEOC charge may implicate – and therefore make timely – incidents otherwise outside of the mandatory filing deadlines."  Miller v. New York City Health & Hosp. Corp., No. 00 Civ. 140, 2004 WL 1907310, at *3 (S.D.N.Y. Aug. 25, 2004) (citing National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114-21, 122, S.Ct.2061,153 L.Ed.2d 106 (2002)).  "[A] continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice."  Cornwell v. Robinson, 23 F.3d 694, 706 (2d Cir. 1994).

For example, the Second Circuit has stated that: "The continuing violation exception applies to cases involving specific discriminatory policies or mechanisms such as

discriminatory seniority lists, or discriminatory employment tests.   However, multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir. 1993) (citations omitted).   Thus, discrete acts are generally insufficient to constitute a continuing violation. See Morgan, 536 U.S. at 114 (termination, failure to promote, denial of transfer and refusal to hire are discrete acts constituting separate actionable unlawful employment practices).

Even assuming the facts in the light most favorable to Plaintiff, this Court finds that the continuing violation doctrine does not apply.  Each alleged layoff constitutes a separate and discrete actionable incident. See Lightfood v. Union Carbide Corp., 110 F.3d 898, 907 (2d Cir. 1997) (repeated demotions and denial of pay increases not sufficient for continuing violation theory).   Plaintiff has not presented any evidence of a discriminatory policy or mechanism, and in fact, Plaintiff concedes that Defendants did not have a seniority-based layoff policy, see Lester Dep., pp. 127-128.  See Bailey v. Colgate-Palmolive Co., No. 99 Civ. 3228, 2003 WL 21108325, at *9 (S.D.N.Y. May 14, 2003)(discussing the fact that failure to set forth discriminatory policy or mechanism is fatal to application of the continuing violation doctrine).

Moreover, the continuing violation doctrine is disfavored in this circuit. See Samimy v. Cornell Univ., 961 F.Supp. 489, 493 (W.D.N.Y. 1997) (citing cases).  Only compelling circumstances will warrant application of the continuing violation exception to the statute of limitations.  Blesedell v. Mobil Oil Co., 708 F.Supp. 1408, 1415 (S.D.N.Y. 1989) (citing LaBeach v. Nestle Co., 658 F.Supp. 676, 687 (S.D.N.Y. 1987)).  No such circumstances are present in this case.  As noted, "multiple incidents of discrimination, even similar ones,

13

that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." Lambert, 10 F.3d at 53.  Consequently, this Court finds that the continuing violation doctrine does not save Plaintiff's untimely Title VII and ADA claims.

### 2.    Administrative Exhaustion

In addition to their timeliness arguments, Defendants maintain that any Title VII or ADA claims other than those based on Plaintiff's layoff on January 22, 2004, must be dismissed on exhaustion grounds because Plaintiff did not first present those claims to the EEOC for investigation.  A plaintiff must ordinarily exhaust his administrative remedies by first presenting his claims to the EEOC.  Bailey, 2003 WL 21108325, at *12.  Failure to exhaust defeats the purpose of Title VII's statutory notice provision, which is "to encourage settlement of discrimination disputes through conciliation and voluntary compliance." Miller v. Int'l Tel. & Tel. Corp., 755 F.2d 20, 26 (2d Cir. 1985); Burnett v. ESL Fed. Credit Union, 198 F.Supp.2d 307, 314-15 (W.D.N.Y. 2002).  Consequently, courts routinely dismiss unexhausted Title VII discrimination claims.  Bailey, 2003 WL 21108325, at *12 (citing cases).

Here, setting aside the hostile work environment claim, the only claim raised in Plaintiff's three EEOC Charges is that he was laid off on January 22, 2004, because of either his race or disability.  None of the other layoffs are referenced in the Charges, nor can they be construed as "reasonably related" to the January 22, 2004 layoff because they predate it.  See Butts v. City of New York Dep't of Hous. Pres. & Dev., 990 F.2d 1397, 1401 (2d Cir. 1993) ("reasonably related" claims must be based on conduct occurring subsequent to the EEOC Charge), superseded by statute on other grounds as stated in,

14

Hawkins v. 1115 Legal Servs. Care, 163 F.3d 684, 693 (2d Cir. 1998); see also Samborski, 2002 WL 1477610, at *5 (same); Townsend v. Exch. Ins. Co., 196 F.Supp.2d 300, 313 (W.D.N.Y. 2002) (same).   Therefore, not only are Plaintiff's claims based on the January 22, 2004 layoff the only timely claims for purposes of Title VII and the ADA, they are also the only claims that have been properly exhausted.

### 3.   Analytical Framework

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1); Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S.Ct. 2148, 2150, 156 L.Ed.2d 84 (2003).  Similarly, the ADA provides that: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment."  42 U.S.C. § 12112(a); Raytheon Co. v. Hernandez, 540 U.S. 44, 124 S.Ct. 513, 515-16, 157 L.Ed.2d 357 (2003).

Plaintiff asserts his race claims in his first three causes of action pursuant to Title VII, § 1981, and § 296 of the New York Human Rights Law.  (Amended Complaint, ¶¶ 8-41.)  Plaintiff asserts his disability claim in his fourth cause of action pursuant to the ADA. (Amended Complaint, ¶¶ 42-53.)  It is well settled that each of these discrimination claims is analyzed under the burden-shifting analysis first set forth by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L.

Ed.2d 668 (1973).  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43,

120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000) (Title VII);   Weinstock v. Columbia Univ.,

224 F.3d 33, 42 n.1 (2d Cir. 2000) (identical standards apply to employment discrimination

claims brought under both Title VII and NY HRL § 296) (citing cases); Reg'l Econ. Cmty.

Action Prog., Inc. v. City of Middletown, 294 F.3d 35, 48-49 (2d Cir. 2002) (ADA); Rose v.

Mendon Leasing Co., 969 F.Supp. 865, 867 n.2 (E.D.N.Y. 1997) (§ 1981 claims are

analyzed under the Title VII framework) (citing Taitt v. Chem. Bank, 849 F.2d 775, 777 (2d

Cir. 1988)).

The burden-shifting test requires that the plaintiff first establish a *prima facie* case

of discrimination.  See McDonnell Douglas, 411 U.S. at 802.  If the plaintiff meets this

burden, a rebuttable presumption of discrimination arises, and the burden then shifts to the

defendant to articulate a legitimate, non-discriminatory reason for the adverse employment

action.  Texas Dep't of Comt'y Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089,

1094, 67 L. Ed.2d 207 (1981).  If the defendant succeeds in making this showing, "the

presumption of discrimination arising with the establishment of the *prima facie* case drops

from the picture."  Weinstock, 224 F.3d at 42 (citing St. Mary's Honor Ctr. v. Hicks, 509

U.S. 502, 510-11, 113 S. Ct. 2742, 125 L. Ed.2d 407 (1993)).  Plaintiff must then produce

"evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for

actual discrimination."  Weinstock, 224 F.3d at 42.  "In short, the question becomes

whether the evidence, taken as a whole, supports a sufficient rational inference of

discrimination."  Id.  However, "[i]t is not enough . . . to disbelieve the employer; the

factfinder must [also] believe the plaintiff's explanation of intentional discrimination."  Id.

(quoting St. Mary's, 509 U.S. at 519).

        **a.**    ***Prima Facie* Case**

        **i.**    **Race Claim**

To establish a *prima facie* case of race discrimination, the plaintiff must set forth evidence that (1) he is a member of a protected class, (2) he was performing his duties satisfactorily, (3) he suffered an adverse employment action, and (4) the circumstances of the adverse action give rise to an inference of discrimination.  See  Farias v. Instructional Sys., Inc., 259 F.3d 91, 98 (2d Cir. 2001);  Weinstock, 224 F.3d at 42 (citing McDonnell Douglas, 411 U.S. at 802).  "The burden of establishing a *prima facie* case of disparate treatment is not onerous."  Burdine, 450 U.S. at 253; see also Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000) (characterizing burden as "minimal").

Defendants argue that Plaintiff cannot make out a *prima facie* case of race discrimination because his job performance was unsatisfactory at the time he was laid off. Specifically, Defendants argue that at the time of the January 22, 2004 layoff, Plaintiff was not meeting production expectations in the "tear down" position, and was not as productive as Loder and Ernest.  In addition, Defendants argue that the circumstances of Plaintiff's layoffs do not support an inference of unlawful discrimination.

Initially, this Court is not persuaded by  Defendants' argument that Plaintiff was not performing his job satisfactorily at the time he was laid off in 2004.  Defendants argue that because Plaintiff performed his job slower than Loder and Ernest, he was not working in a satisfactory manner.  For purposes of establishing a *prima facie* case, however, Plaintiff does not have to demonstrate that he was the fastest or best at his job, but only that his

performance was satisfactory.  One can certainly be performing his job satisfactorily, but at the same time be the slowest or least productive relative to other employees.  While the record evidence establishes that Defendants considered Plaintiff not to be as productive as Loder and Ernest, it appears that Plaintiff's work performance overall was satisfactory.  Indeed, Defendant repeatedly rehired Plaintiff, including to work in the "tear down" area, despite knowing that Plaintiff did not work quickly.  In any event, Defendants' argument is relevant only to the January 22, 2004 layoff.  Defendants do not argue that Plaintiff was unsatisfactorily performing his job as a laborer for purposes of the other layoffs.  Accordingly, this Court finds that the second prong of a *prima facie* case is satisfied.

However, on the fourth prong, this Court finds that the circumstances under which Plaintiff was laid off, which for purposes of this motion are undisputed, fail to support an inference that race played any part in the decisions.  First, beginning with the layoffs in 1999 or 2000,[7] each layoff was instituted by M&M Knopf due to a non-discriminatory reason – lack of work.  Second, M&M Knopf adhered to the acceptable and legitimate policy of laying off the least productive employees whose job duties could be absorbed by the remaining employees.  Orisek v. Am. Inst. of Aeronautics and Astronautics, 938 F.Supp. 185, 188, 190-92 (S.D.N.Y. 1996) (employer may select employees for layoffs based on their flexibility, productivity and performance).  It is undisputed that Defendants identified Plaintiff as one such employee each time a layoff was required.

Third, each time Plaintiff was laid off, individuals of other races were also laid off.

---

[7]Although not specified, this Court assumes for purposes of analysis only, that this layoff occurred on or after October 18, 2000, thereby making it actionable as part of Plaintiff's § 1981 claim.  All claims based on events that predate October 18, 2000, are time-barred.

18

For example, in 1999 or 2000, Plaintiff was laid off with an Asian employee, Laysoth Soy. In January of 2003, Plaintiff was laid off with John Haak, a Caucasian.  On January 22, 2004, Gahagan laid off Plaintiff *after* he laid off a Caucasian employee, Joseph Vega. Finally, the fact that Gahagan recalled Plaintiff after each layoff, and did so instead of recalling the Caucasian employees (Haak and Vega), dispels any reasonable inference that M&M Knopf selected Plaintiff for each or any layoff because he is African-American. Plaintiff has therefore failed to establish a *prima facie* case of racial discrimination.

## ii.    Disability Claim

In order to establish a *prima facie* case of disability discrimination under the ADA, the plaintiff must submit evidence that (1) the defendant is covered by the ADA, (2) he is disabled within the meaning of the ADA, (3) he can perform the essential functions of his job with or without a reasonable accommodation, and (4) he was subject to an adverse employment action because of his disability.  See Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 149-50 (2d Cir. 1998) (citing Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 869-70 (2d Cir. 1998)).

Defendants appear to concede that they are covered entities subject to the ADA.[8] However, they argue that Plaintiff cannot make out a *prima facie* case of disability discrimination because he cannot establish that he is disabled within the meaning of the ADA, nor can he establish that he suffered an adverse employment action because of his disability.

---

[8]A covered entity is "an employer, employment agency, labor organization, or joint labor-management committee."  42 U.S.C. § 12111(2).  "The term employer means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year."  29 C.F.R. § 1630.2(e)(1).

Disability determinations under the ADA are made on a case-by-case basis. Reeves, 140 F.3d at 151-52 (citing cases).  Under the ADA, a disability is defined as follows:

> The term "disability" means, with respect to an individual –
>
> (A)  a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B)  a record of such an impairment; or
>
> (C)  being regarded as having such an impairment.

42 U.S.C. § 12102(2).

The United States Supreme Court has articulated a three-step approach for determining whether a plaintiff has a disability under the first definition of "disability" in the statute.  See Bragdon v. Abbott, 524 U.S. 624, 631, 118 S.Ct. 2196, 2202, 141 L.Ed.2d 540 (1998); Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 641 (2d Cir. 1998).  First, the court must determine whether the plaintiff suffers from a qualifying physical or mental impairment.  Bragdon, 524 U.S. at 631.  Second, the court must identify the activity that plaintiff claims is impaired, and then determine whether that activity constitutes a "major life activity."  Id.  Third, the court must determine whether the plaintiff's impairment "substantially limited" the identified major life activity.  Id.

Given the minimal burden at this stage, this Court finds that based on Plaintiff's deposition testimony, his affidavit and the attached Social Security decision, Plaintiff has adequately established that he is disabled within the meaning of the ADA.[9]   However,

---

[9]For purposes of this decision only, this Court assumes that the Social Security decision constitutes admissible evidence.

Plaintiff nonetheless fails to establish a *prima facie* case because there is no evidence from which it could be inferred that Defendants laid him off because of his disability.

The EEOC regulations interpreting the ADA[10] define "mental impairment" as follows:

> Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h)(1).

Defendants do not argue that Plaintiff's alleged fetal alcohol syndrome falls outside of this definition. Accordingly, for purposes of this analysis, this Court will assume that fetal alcohol syndrome, with its attendant mental impairments, is a qualifying mental impairment under the ADA.

Moreover, Plaintiff has sufficiently identified major life activities – work and reading – that are impaired by his disability. (Plaintiff's Memorandum, pp. 7, 9.) "Major life activity" means "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I). This list is illustrative not exhaustive. Bragdon, 524 U.S. at 639. The relevant inquiry is whether the identified activity is a significant one within the meaning of the ADA, not whether it is of significance or importance to a particular individual. Id. at 642. Work and reading constitute major life activities under the ADA. See Bartlett v. N.Y. State Bd. of Law Examiners, 226 F.3d 69, 80 (2d Cir. 2000) (work and reading); see also Head v. Glacier

---

[10]This Court notes that there are two sources of guidance for interpreting the provisions of the ADA in the context of employment discrimination: the EEOC regulations cited herein and the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 706(8)(b), and its accompanying regulations. See Toyota Motor Mfg. v. Williams, 534 U.S. 184, 193, 122 S.Ct. 681, 689, 151 L.Ed.2d 615 (2002); see also Sutton v. United Airlines, Inc., 527 U.S. 471, 477-81, 119 S.Ct. 2139, 2144-47, 144 L.Ed.2d 450 (1999) (discussing interpretive regulations for the ADA).

Northwest, Inc., 413 F.3d 1053, 1061-62 (9th Cir. 2005) (reading); 29 C.F.R. § 1630.2(I)

(work).

Finally, this Court finds that for purposes of a *prima facie* case, Plaintiff has

mustered enough evidence from which it could be concluded that his impairment

"substantially limited" at least his ability to work.[11]  Id.   Under the regulations, the term

"substantially limits" means:

> (I)     Unable to perform a major life activity that the average
>           person in the general population can perform; or
>
> (ii)    Significantly restricted as to the condition, manner or
>           duration under which an individual can perform a
>           particular major life activity as compared to the
>           condition, manner, or duration under which the average
>           person in the general population can perform that same
>           major life activity.

29 C.F.R. § 1630.2(j).

While the evidence is scant, drawing all inferences in Plaintiff's favor, this Court

finds that a jury could conclude that his ability to work and/or read is severely restricted by

his disability.  Plaintiff testified that although he can read, he is a slow learner and cannot

comprehend things.  (Lester Dep., pp. 146-47.)  He further testified that his sister and

father help him take care of himself at home.  (Lester Dep., p. 149.)  As far as work, he

testified that he could not remember numbers of parts that were requested verbally, and

instead, Gahagan would write them on a piece of paper.  (Lester Dep., p. 147-48.)  He

further testified that he could not remember verbal directions given to him by his superiors

and could not comprehend their instructions.  (Lester Dep., p. 154.)  He also testified that

---

[11]Plaintiff concedes in his deposition that he can read, but there is no information before this Court
demonstrating the extent of his proficiency.  (Lester Dep., Dep. pp. 14, 139.)

he learned only a quarter of his job at M&M Knopf, despite having been there for eight

years. (Lester Dep., p. 159.)  These mental failings would hinder Plaintiff in any job.  In this

Court's view, Plaintiff has adequately set forth evidence that his ability to work and/or read

is severely restricted by his disability for purposes of establishing a *prima facie* case.[12]

However, for the same reasons Plaintiff cannot demonstrate that race played any

---

[12]Plaintiff also briefly argues that Defendants regarded him as disabled.  (Plaintiff's Memorandum, p. 11.)  Defendants may be liable for unlawful discrimination if evidence exists from which it could reasonably be concluded that they regarded Plaintiff as suffering from an impairment that qualifies as a disability under the ADA.  See 42 U.S.C. § 12102(2)(C); Weltz v. City of New York, No. 99 Civ. 3932, 2004 WL 1907309, at *6 (S.D.N.Y. Aug. 25, 2004).  The term "is regarded as having such an impairment" means:

> (1)     Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;
>
> (2)     Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
>
> (3)     Has none of the impairments defined in paragraph (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(l).

The Second Circuit has held that a plaintiff must do more than show that his employer regarded him as "somehow disabled; rather, the plaintiff must show that the employer regarded [him] as disabled *within the meaning of the ADA.*"  Colwell, 158 F.3d at 646 (emphasis in original); see also Francis v. City of Meriden, 129 F.3d 281, 285-86 (2d Cir. 1997).  "'[T]he mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action.'"  Reeves, 140 F.3d at 153 (quoting Kelly v. Drexel Univ., 94 F.3d 102, 109 (3d Cir. 1996)).  "The plaintiff is 'required to adduce evidence' that the employer regarded him 'as having an impairment that substantially limited a major life activity."  Weltz, 2004 WL 1907309, at *6 (quoting Colwell, 158 F.3d at 646.)  In this context, whether the plaintiff is actually disabled under the ADA is irrelevant, it is the employer's perception that counts.  See Colwell, 158 F.3d at 646.

Plaintiff argues that he advised Gahagan during the first two years of his employment with M&M Knopf that his mother was an alcoholic and that he had fetal alcohol syndrome and was not a fast learner.  (Lester Dep., pp. 31-32.)  Gahagan allegedly responded "no problem" and "that's okay."  (Lester Dep., pp. 32-33.)  However, there is no evidence that Gahagan or any other individual at M&M Knopf regarded Plaintiff as disabled within the meaning of the ADA.  Simply being aware that Plaintiff was a slow learner or had fetal alcohol syndrome is not enough to support a finding that Defendants regarded Plaintiff as disabled under the ADA.  Reeves, 140 F.3d at 153.

Plaintiff also argues that the Defendants regarded him as disabled because they repeatedly told him he was slow.  However, Plaintiff makes clear in his deposition testimony that he understood the references to him being slow as a comment on the pace at which he performed his job duties, rather than on his mental capabilities.  (Lester Dep., pp. 68, 92-94, 107-08, 211.)  Thus, this Court finds that Plaintiff has not come forward with evidence that Defendants regarded him as disabled within the meaning of the ADA.

part in Defendants' decisions to lay him off, he cannot establish that he was laid off because of his disability.  Given Plaintiff's failure to contest Defendants' reasons for laying him off, as discussed below on the third prong of the <u>McDonnell Douglas</u> analysis,  he cannot establish that he was laid off because of his disability.  He therefore cannot demonstrate a *prima facie* case of disability discrimination.  <u>Reeves</u>, 140 F.3d at 149-50.

### b.    Defendants' Legitimate, Non-Discriminatory Reason

Assuming for the sake of argument that Plaintiff has established a *prima facie* case of race and/or disability discrimination, the burden is now on Defendants to produce a legitimate, non-discriminatory reason for terminating Plaintiff's employment.  <u>See</u> <u>Reeves</u>, 530 U.S. at 142 (noting that the defendant's burden at the second stage is not one of proof or persuasion, but is more appropriately considered a burden of production.)   "This explanation must be 'clear and specific.'"  <u>Gallo</u>, 22 F.3d at 1226 (quoting <u>Meiri</u>, 759 F.2d at 997).

Defendants maintain that they laid off Plaintiff several times during the course of his employment due to work shortages.   Layoffs are a recognized legitimate, non-discriminatory reason for termination.  <u>See</u> <u>Parcinski v. Outlet Co.</u>, 673 F.2d 34, 36-37 (2d Cir. 1982).  Moreover, Defendants assert that they laid off Plaintiff because he was, in their view, one of their least productive and least knowledgeable employees at the time of the layoffs.  Thus, Defendants' selection of Plaintiff for the layoffs was consistent with their policy of retaining the most qualified and versatile employees.  Such a layoff policy is permissible.  <u>See</u> <u>Orisek</u>, 938 F.Supp. at 191 (employee may be chosen for layoff based on skills).

Based on the above, this Court finds that Defendants have articulated a legitimate, non-discriminatory reason for Plaintiff's several layoffs.  The presumption of discrimination created by Plaintiff's demonstration of a *prima facie* case, assuming he could demonstrate one, now "drops out of the picture."  Hicks, 509 U.S. at 511.

### c.    Pretext for Intentional Discrimination

The burden now returns to Plaintiff to demonstrate that Defendants' non-discriminatory reason is mere pretext for actual unlawful discrimination.  "Where a plaintiff has alleged that an employer's reasons for an adverse employment action are pretextural, all reasonable inferences must be drawn in favor of the plaintiff's showing of pretext." Joseph v. Manhattan & Bronx Surface Transit Operating Auth., No. 96 Civ. 9015, 2004 WL 1907750, at *14 (S.D.N.Y. Aug. 25, 2004).   At this stage, the court must "examin[e] the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (quoting Reeves, 530 U.S. at 143.)  This requires the court to determine whether "there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible [discrimination]." Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 443 (2d Cir. 1999).

A defendant's proffered non-discriminatory reason, however, "cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason."  Olle v. Columbia Univ., 332 F.Supp.2d 599, 617 (S.D.N.Y. 2004) (quoting Hicks, 509 U.S. at 502); see also AB v. Rhinebeck Cent. Sch.

Dist., 224 F.R.D. 144, 153 n.9 (S.D.N.Y. 2004).  Therefore, to avoid summary judgment,

Plaintiff must establish the existence of a genuine issue of fact as to whether Defendants'

proffered explanations are false and a mere pretext for unlawful discrimination.  Weinstock,

224 F.3d at 42.  Unless Plaintiff can point to evidence that reasonably supports a finding

of prohibited discrimination, Defendants are entitled to summary judgment.  See James v.

NY Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000).

An unfortunate, but hardly surprising consequence of Plaintiff's failure to contest

Defendants' statement of facts or submit record evidence in support of his claims is that

his ability to sustain his case is severely impaired.[13]  See Anderson, 477 U.S. at 249

("There is no issue for trial unless there is sufficient evidence favoring the nonmoving party

for a jury to return a verdict for that party.").

In this Court's view, Plaintiff has failed to identify any evidence from which a

reasonable jury could find that Defendants laid him off at any time because he is African-

American or disabled.   First, Plaintiff does not contest the fact that Defendants

implemented each layoff because of a lack of work.  (Defendants' Statement, ¶¶ 24, 30,

46.)  Moreover, Plaintiff has not set forth any evidence from which it could be concluded

that this business-related reason for implementing the layoffs is false.

Second, Plaintiff is deemed to admit that Defendants' layoff policy is not based on

seniority, but rather, is guided by their desire to "maintain the most qualified workforce by

focusing on such factors as the productivity, versatility, and qualifications of individual

---

[13]The only evidence submitted in support of Plaintiff's opposition to Defendants' motion is the
Affidavit of David Lester, and the Social Security decision attached thereto.  This affidavit, however, does
not address Plaintiff's race-based discrimination claims, nor does the Social Security decision.

employees." (Defendants' Statement, ¶ 18.) Plaintiff also admits that Defendants consider whether the remaining employees would be able to assume the laid off employee's job duties. (Defendants' Statement, ¶ 19.) As noted, these are acceptable, non-discriminatory factors that employers may properly consider in implementing layoffs.

Third, Plaintiff is deemed to admit that he was selected for each layoff because Defendants identified him as one of the least productive employees and determined that other employees could perform his job duties.  (Defendants' Statement, ¶¶ 26, 33, 48.) Although Plaintiff may disagree with Defendants' characterization of his job performance, his disagreement is inconsequential, and in any event, he offers no evidence to support his argument that he was not the least productive employee.  See Meiri, 759 F.2d at 995; Orisek, 938 F.Supp. at 191 ("[The plaintiff's] own disagreement with [his] employer's perceptions of [his] job performance does not satisfy her burden of showing that [the employer's] proffered justification was a pretext for discrimination."). Thus, whether Plaintiff was, in fact, one of the least productive employees is largely irrelevant.  Defendants' motivation for laying off Plaintiff is what is at issue.  And in that regard, it is undisputed – and indeed, admitted – that the reason Defendants laid off Plaintiff was because they considered him one of their least productive employees.

Even if Defendants were incorrect in this assessment (i.e., Plaintiff was not the least productive employee), Plaintiff fails to identify any evidence in the record that would support a finding that Defendants laid him off because he is African-American or disabled. Therefore, even if the jury credited Plaintiff's assertion that he was not the least qualified employee, there is no evidence in the record that would allow it to take the next step and find that Plaintiff was the victim of unlawful discrimination.  See Celotex Corp. v. Catrett,

477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (moving party is entitled to judgment as a matter of law if the nonmoving party fails to make a sufficient showing on an essential element of the case on which it has the burden of proof).

Fourth, the undisputed nature of the relationship between Gahagan and Plaintiff undermines any inference that the layoffs at issue were motivated by race or disability. Their history of working together dates back to their days at World Auto Parts beginning in 1988.  (Lester Dep., p. 15.)  Over the years at M&M Knopf, it was Gahagan who made the decisions to lay off Plaintiff, and Gahagan who made the decisions to rehire him.  This long-standing relationship, and Gahagan's repeated hiring of Plaintiff instead of non-African-American (and non-disabled) employees such as Soy, Haak and Vega, weigh heavily against an inference of discrimination.[14]  See Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997) (commenting that "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [him] an invidious motivation").

Finally, Plaintiff has presented no evidence that similarly situated non-African-American employees were treated more favorably than he was.  In fact, the undisputed evidence establishes the opposite.  When Defendants laid off Plaintiff in 1999 or 2000, they also laid off Soy, an Asian employee.  When Defendants laid off Plaintiff in January of 2003, they also laid off Haak, a Caucasian employee.  When Defendants laid off Plaintiff on January 22, 2004, they did so *after* laying off Vega, a Caucasian employee.  Moreover, when Defendants were in a position to rehire employees after the 2003 and 2004 layoffs,

---

[14]It should also be noted that Gahagan hired Plaintiff's nephew, Reggie Lester, who is also African-American.  (Defendants' Statement, ¶ 28.)

they recalled Plaintiff, rather than hire a new employee or recall Haak or Vega.[15]  It is thus clear that Defendants laid off Caucasian and Asian employees for the same or similar reasons as they laid off Plaintiff.  In light of these undisputed facts, Plaintiff is unable to prove that Defendants treated similarly situated non-African-American employees more favorably.

Plaintiff argues that Defendants' reasons for his layoff are pretextural because Defendants did not follow seniority in determining which employees should be laid off.  However, it is undisputed that Defendants' do not have a policy of making layoff decisions based on seniority.  Thus, this is not a case where an employer deviates from an established seniority-based policy to layoff an employee for an unlawful reason.  While Plaintiff may prefer that Defendants use a seniority-based system, Defendants are not required to do so.

Plaintiff also appears to argue that an inference of pretext can be drawn from the fact that Defendants laid off Plaintiff in 2004, rather than assign him to a laborer position.  However, it is undisputed that Plaintiff was hired to work in the "tear down" area, not as a laborer.  Moreover, Plaintiff has set forth no evidence demonstrating that a laborer position was available at the time of the January 2004 layoff.  In the absence of any evidence that a laborer position was available, no trier of fact could reasonably conclude that Defendants refused to reassign Plaintiff, and instead laid him off because he is African-American and/or disabled.

Accordingly, this Court finds that there are no disputed issues of material fact or any

---

[15]In this way, one could argue that Defendants' actually treated Plaintiff *more* favorably than non-African-Americans.

evidence from which a reasonable factfinder could conclude that Defendants laid off Plaintiff because he is African-American and/or disabled.  Plaintiff has thus failed to carry his burden of demonstrating that Defendants' legitimate, non-discriminatory reason for laying him off is false, and that Defendants actually discriminated against him because of his race or disability.  Defendants are therefore entitled to summary judgment on Plaintiff's discrimination claims.  See James, 233 F.3d at 154.

**D.   Plaintiff's Hostile Work Environment Claims**

The Supreme Court has held that Title VII's protection extends beyond "economic" or "tangible" discrimination.  Harris v. Forklift Sys., 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L. Ed. 2d 295 (1993) (citing Meritor Savings Bank, FSV v. Vinson, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed. 2d 49 (1986)).  Rather, Congress enacted Title VII to "strike at the entire spectrum of disparate treatment of men and women in employment," including the requirement that employees work in a hostile or abusive environment.  Harris, 510 U.S. at 21.

Plaintiff claims that Defendants subjected him to a hostile work environment. (Amended Complaint, ¶¶ 8-41.)  To survive a motion for summary judgment, a plaintiff claiming that he was the victim of a hostile work environment must produce evidence from which a reasonable trier of fact could conclude "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003) (quoting Richardson, 180 F.3d at 436).  "The sufficiency of a hostile

work environment claim is subject to both subjective and objective measurement: the plaintiff must demonstrate that [he] personally considered the environment hostile, and that the environment rose to some objective level of hostility."  Leibovitz v. NY City Transit Auth., 252 F.3d 179, 188 (2d Cir. 2001).

Defendants argue that they are entitled to summary judgment because (1) the comments and incidents relied on by Plaintiff are not sufficiently severe, and (2) there is no basis to impute the offending conduct to them.

### 1.    Severity of Work Environment

Courts examine various factors to ascertain whether a work environment is sufficiently hostile or abusive to support a Title VII claim.  These factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance."  Leibovitz, 252 F.3d at 188 (citing Harris, 510 U.S. at 23); Terry v. Ashcroft, 336 F.3d 128, 147-48 (2d Cir. 2003).  Isolated and occasional instances of harassment do not ordinarily rise to this level.  See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270-271, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (per curiam).  The appropriate test is whether the "harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse. . . ." Torres v. Pisano, 116 F.3d 625, 632 (2d Cir. 1997).  The Second Circuit has stated:

> The environment need not be unendurable or intolerable.  Nor must the victim's psychological well-being be damaged.  In short, the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases.

Terry, 336 F.3d at 147-48 (quotations, citation and alterations omitted).

This Court finds that there is sufficient evidence in the record from which a reasonable jury could find that Plaintiff was subjected to severe and pervasive discriminatory conduct on account of his race or disability that altered his work environment. The evidence supports such a finding on both the subjective and objective prongs. Leibovitz, 252 F.3d at 188.

For example, Plaintiff testified to the following in his deposition:

- Gahagan called Plaintiff a "fucking idiot" when Plaintiff put the wrong parts on a sorting table (Lester Dep., p. 46);

- Gahagan told a vendor "don't get niggerly on me" (Lester Dep., p. 48);

- Gahagan said on five separate occasions that he could "teach a monkey" how to unload a truck (Lester Dep., pp. 50, 51, 55-56);

- Two of Gahagan's vendor friends raised a Confederate flag on M&M Knopf's flagpole (Lester Dep., p. 58);

- A vendor came to M&M Knopf more than once with a Confederate flag on the back of his truck (Lester Dep., p. 59.);

- Orrange called Plaintiff a "fucking idiot" and "fucking stupid man" after Plaintiff turned on a faucet where Orrange had placed paper towels in the basin (Lester Dep., p. 64.);

- Orrange told Plaintiff to "shove it up your ass" after Plaintiff asked him where he should put a drum (Lester Dep., p. 65);

- Orrange curses a lot at various employees (Lester Dep., p. 64);

- Jason Klein, one of Plaintiff's co-workers on the dock used the word "nigger" nearly every day and at least more than 100 times per month or 1,000 times a year (Lester Dep., pp. 113, 114, 116);

- After Plaintiff asked Klein to stop using the term "nigger," Klein continued and would say "nigger this and nigger that" and would say in general, "you my nigger, how's my nigger" (Lester Dep., p. 116);

•      Klein repeatedly said "my nigger" and "hello nigger" (Lester Dep., pp. 116-117);

•      A vendor made a racial joke directly to Plaintiff and when he complained, Gahagan told him "come on, Dave, I'll talk to him about it.  He didn't mean nothing by it. Come on" (Lester Dep., p. 119);

•      A vendor made racial jokes about blacks having homosexual sex in prison while Gahagan and Plaintiff were on the docks (Lester Dep., pp. 122-123);

Defendants argue that these incidents are not sufficiently serious to raise a hostile work environment claim.  For example, they note that Gahagan's "niggerly" comment was not directed at Plaintiff, and Plaintiff did not complain to Gahagan about it.  (Lester Dep., pp. 48, 49.)  They further note that Plaintiff understood Gahagan to be talking about "unskilled labor," rather than African-Americans, when he talked about teaching monkeys to unload trucks.  (Lester Dep., p. 53.)  They also note that Plaintiff did not directly report Klein's offensive behavior to Gahagan.[16]  (Lester Dep., p. 117.)  Nonetheless, in this Court's view, these incidents viewed in their totality (if found by a jury to have occurred), are sufficiently pervasive, severe, and frequent to support a finding that Plaintiff's workplace was altered for the worse.  See Torres, 116 F.3d at 632; Leibovitz, 252 F.3d at 188.

## 2.      Imputation of Conduct to the Employer

Defendants argue that Plaintiff cannot meet the second prong of the analysis because there is no basis for imputing the conduct that created the hostile environment to

---

[16]This Court notes that Plaintiff stated that he did not complain about several events because Gahagan was present or out on the dock and witnessed a majority of the conduct.  (Lester Dep., p. 117.) In any event, "unreported incidents of harassment alleged by the plaintiff regarding the issue of hostile work environment, whether or not an explanation for the failure to report is proffered, stand on the same footing as reported incidents; both must be taken as true at the summary judgment stage."  Distasio v. Perkin Elmer Corp., 157 F.3d 55, 62-63 (2d Cir. 1998); Nader v. Brunalli Const. Co., 98 CV 2085, 2002 WL 724597, *10 (D.Conn. Mar. 26, 2002).

them.  See Mack., 326 F.3d at 122 (quoting Richardson, 180 F.3d at 436).  This Court finds

otherwise.  Drawing all inferences in Plaintiff's favor, it appears that Gahagan, who was the

general manager, had direct knowledge of the conditions of which Plaintiff complains.

Plaintiff complained to Gahagan in July of 2001 about the monkey and niggerly comments,

and Gahagan told him "it's off the cuff, I don't mean it, we're family, don't worry about it."

(Lester Dep., p. 54.)  Gahagan also brushed Plaintiff aside when he complained about

vendors telling racial jokes by saying "come on, Dave, he didn't mean nothing by it."

(Lester Dep. p. 119.)  In addition, Plaintiff testified that Gahagan was present on the dock

and heard and saw Klein using the term "nigger" nearly every day.  (Lester Dep., pp. 113-

115, 117, 139.)  Finally, Plaintiff stated that when he complained about the offending

conduct too much, Gahagan told him that he should think about working at another job.

(Lester Dep., p. 54.)

Accordingly, this Court finds that a reasonable trier of fact could conclude that

Gahagan had direct knowledge of not only his own offensive behavior, but also that of

Plaintiff's co-workers.  Moreover, the trier of fact could conclude that Gahagan did not act

effectively to remedy the hostile work environment.  See Quinn v. Green Tea Credit Corp.,

159 F.3d 759, 766 (2d Cir. 1998) (employer liable for co-worker harassment if it "knew of

the harassment, but did nothing about it").  Consequently, Defendants are not entitled to

summary judgment on Plaintiff's hostile work environment claim.[17]

---

[17]This Court rejects Defendants' argument that it is shielded from liability because it had a
complaint procedure in place.  As noted, the record evidence suggests that Gahagan had direct
knowledge of the hostile work conditions. In any event, Plaintiff testified that he complained to Gahagan on
various occasions.  Thus, it could be found that he complied with the complaint policy.

**E.     Plaintiff's Constructive Discharge Claim**

Plaintiff alleges that Defendants constructively discharged him.   (Amended Complaint, ¶¶ 54-60.)  "A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188 (2d Cir. 1987) (quotation and citation omitted); see also Petrosino v. Bell Atlantic, 385 F.2d 210, 229 (2d Cir. 2004).   The employer's conduct in causing the employee's resignation must constitute "deliberate action." Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 74 (2d Cir. 2000).

"The same circumstances and facts that a court examines in reviewing a plaintiff's hostile work environment claim are examined on a plaintiff's constructive discharge claim." Legrand v. New York Rest. Sch./Educ. Mgmt. Corp., No. 02 Civ. 2249, 2004 WL 1555102, at *8 (S.D.N.Y. July 12, 2004) (citing Arroyo v. WestLB Admin., Inc., 54 F.Supp.2d 224, 231-32 (S.D.N.Y. 1999)).   However, the Supreme Court has made clear that "a hostile-environment constructive discharge claim entails something more [than a showing of a hostile work environment]: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign." Pa. State Police v. Suders, 542 U.S. 129, 147, 124 S.Ct. 2342, 2354, 159 L.Ed.2d 204 (2004).

Defendants argue that they are entitled to summary judgment on this claim because (1) there is no evidence that they acted deliberately to force Plaintiff to leave his job, and (2) a reasonable person under similar circumstances would not have felt compelled to

35

abandon their position.

Having thoroughly reviewed the record, this Court finds that no reasonable factfinder could conclude that Defendants constructively discharged Plaintiff.  Even assuming the existence of a hostile work environment as Plaintiff describes, there is no evidence in the record to support a finding that Defendants deliberately created this environment or deliberately failed to correct the environment in an effort to force Plaintiff to leave.  There is no evidence in the record that Defendants ever wanted Plaintiff to leave his position – in fact, it is undisputed that each layoff was economically motivated.  Defendants' repeated rehiring of Plaintiff negates any finding that they were acting deliberately to force him to resign.  Defendants' inability to remedy the hostile conditions does not translate to a finding of deliberateness.  See Whidbee, 223 F.3d at 74 (citing cases) (constructive discharge claim must fail if it is predicated on the employer's mere negligence, ineffectiveness or incompetence).  There is simply no evidence that Defendants created or maintained the alleged intolerable work environment to force Plaintiff out.

Moreover, no reasonable trier of fact could conclude that the environment Plaintiff worked in was so hostile and intolerable that any reasonable person would resign.  While it appears that the work conditions at Great Lakes were perhaps insulting, crude and crass, Plaintiff himself voluntarily returned to this work environment on five separate occasions over the course of his eight-year employment with Defendants.  In addition, Plaintiff repeatedly telephoned Defendants after his layoff in January of 2004, hoping to be rehired. (Defendants' Statement, ¶ 57.)  He then went back to work at Great Lakes for two days in April of 2004, and never returned.  Plaintiff testified at his deposition that he did not return because he was "uncomfortable" and felt "uneasy."  (Lester Dep., p. 103.)  These feelings

were apparently attributable to his belief that he may be laid off again and may have to fill out additional application paperwork.  (Lester Dep., p. 104-105.)  Thus, from Plaintiff's own testimony, it does not appear that the conditions at Great Lakes are what caused him to leave his job.  Moreover, there is simply no evidence in the record that the conditions at Great Lakes were any worse during the two days Plaintiff returned to work in April, than they were in the eight years prior.

Consequently, this Court finds that Plaintiff is unable to prove his constructive discharge claim.  Summary judgment in Defendants' favor is therefore warranted.  <u>See</u> <u>Ochei v. Coler/Goldwater Memorial Hosp.</u>, No. 00 CIV 4702, 2006 WL 2589202, at *10 (S.D.N.Y. Aug. 31, 2006) (constructive discharge claim must be dismissed as a matter of law if evidence is insufficient to permit factfinder to conclude that employer acted deliberately and the conditions were so intolerable that any reasonable person would be compelled to resign).

## IV.  CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is granted in part and denied in part consistent with this Decision and Order.  Only Plaintiff's hostile work environment claims survive.

## V.  ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 34) is GRANTED in part and DENIED in part consistent with this Decision and Order.

FURTHER, that counsel shall appear before this Court for a status conference on October 26, 2006, at 9:00 a.m..

SO ORDERED.

Dated: September 28, 2006
Buffalo, New York

<u>/s/William M. Skretny</u>
WILLIAM M. SKRETNY
United States District Judge